UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NIKITA SMITH AND
KEVIN THOMAS,

    Plaintiffs,

           CASE NO. 16-11882

vs.

           HON. GEORGE CARAM STEEH

CITY OF DETROIT, AND
POLICE OFFICER BASHAWN GAINES,
POLICE OFFICER WILLIAM MORRISON,
POLICE OFFICER RYAN PAUL,
POLICE OFFICER JEFFREY WAWRZYNIAK,
POLICE OFFICER SADIE HOWELL, AND
SGT. ROY HARRIS,

    Defendants.
_____/

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DOC. 23]

On January 14, 2016, police officers shot and killed three dogs while

executing a search warrant at the home in which Nikita Smith ("Smith") and

Kevin Thomas ("Thomas") were squatting. The dog owners, Smith and

Thomas (collectively, "Plaintiffs") now bring a 42 U.S.C. § 1983 action

against Detroit Police Department officers William Morrison ("Morrison"),

Bashawn Gaines ("Gaines"), Ryan Paul ("Paul"), Jeffrey Wawrzyniak

("Wawrzyniak") and Sadie Howell ("Howell"), as well as Detroit Police

sergeant Roy Harris ("Harris"), for unlawfully seizing their three dogs in violation of the Fourth Amendment. Plaintiffs bring three alternate *Monell* claims against the City of Detroit, and bring State law claims for conversion and intentional infliction of emotional distress against all five police officers, the police sergeant, and the City of Detroit (collectively, "Defendants"). The case is before the court on Defendants' motion for summary judgment.

Defendants make ten arguments in their motion for summary judgment. They argue: (1) that all individual defendants are entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 claims for illegal seizure of the dogs because Plaintiffs had no legitimate possessory interest in their dogs, which were not licensed in violation of Michigan and City of Detroit laws; (2) that Officer Wawrzyniak, Officer Howell, and Sergeant Harris are entitled to summary judgment on all claims because they did not shoot the dogs; (3) that all claims by Smith should be dismissed because she was not an owner of the dogs; (4) that all individual defendants are entitled to summary judgment due to qualified immunity; (5) that the City of Detroit is entitled to summary judgment on Plaintiffs' claims for conversion and intentional infliction of emotional distress due to government immunity; (6) that the City of Detroit is entitled to summary judgment on Plaintiffs' *Monell* claims; (7) that all individual defendants are entitled to summary judgment

for the conversion claims due to privilege, and, if not, that damages are limited to the value of the dogs under Michigan law; (8) that the Plaintiffs' claims for intentional infliction of emotional distress are subject to summary judgment; (9) that the individual defendants are immune from the Plaintiffs' conversion and intentional infliction of emotional distress claims under *Odom v. Wayne County*, 482 Mich. 459 (2008); and (10) that there is no genuine issue of material fact that at least one of Plaintiffs' dogs presented an imminent threat to Officers Paul and Wawrzyniak.

For the reasons below, the court GRANTS Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

This case arises out of a drug raid conducted on January 14, 2016 at 18488 Sussex, Detroit, MI. Plaintiffs, Smith and Thomas, began squatting at this residence (the "residence") shortly after Thanksgiving in 2015. They were accompanied by three unlicensed dogs: "Debo," a nine-year-old Pit Bull; "Smoke," a seven-year-old Rottweiler; and "Mama," an ironically named seventeen-month-old pregnant Pit Bull. Before Thomas started dating Smith, he purchased Debo for $600. (Thomas Dep. at 13). Additionally, he paid around $200 for Smoke. (*Id.*). The record does not indicate how much Thomas paid for Mama.

In January 2016, neighbors lodged complaints to the narcotics hotline that Smith and Thomas were occupying, and selling marijuana out of, the residence. (Wawrzyniak Dep. at 8-9). Officer Wawrzyniak then oversaw the controlled purchase of marijuana by a confidential informant at the residence on January 11, 2016. (*Id.*). Officer Wawrzyniak asked the informant whether there were any dogs in the residence, to which the informant replied that he "thought he heard a small dog." (*Id.* at 14).

On January 12, 2016, police obtained a warrant to search the residence for narcotics. Officers Gaines, Howell, Morrison, Paul and Wawrzyniak, and Sergeant Harris arrived at the residence to execute the search warrant on January 14, 2016. The officers conducted a quick briefing immediately before the raid, during which Officer Wawrzyniak discussed the residence's location, the controlled purchase that had taken place there, described the seller, and told everyone that an informant had indicated that there might be a small dog inside the residence. (Morrison Dep. at 30; Gaines Dep. at 10; Wawrzyniak Dep. at 16). At his deposition, Officer Wawrzyniak described the plans the officers had in case they were confronted by dogs at the residence: "The first two guys that walks through that door with the long guns and if they can kick [the small dogs] out of the way and they proceed to run to a corner, fine, but if they come back to

attack then you just have to eliminate that threat so no one gets bit." (Wawrzyniak Dep. at 16-17). When asked whether the only two options for dealing with dogs were to "either shoot or kick away," Officer Wawrzyniak responded "absolutely," and that the police "have no other tool to deal with a dog." (*Id.* at 17).

Upon arriving at the residence, the police officers gathered on the front porch, knocked and announced their presence, and announced several times that they had a search warrant. (Morrison Dep. at 27). Before breaching the door, police officers heard the dogs barking. (Gaines Dep. at 8, 13; Wawrzyniak Dep. at 29). According to Officer Gaines, the police did not change their plans when they became aware of the three dogs because they were concerned that Smith would flush narcotics down the drain if they delayed conducting the search. (Gaines Dep. at 16). Smith contends that when she saw the officers in front of her house and the dogs started barking, she called out that she was going to secure the dogs. (Smith Dep. at 20-21). She then put Debo and Mama in the basement and pushed the stove in front of the stairs leading down to the basement. Smoke was already in the bathroom behind a closed door.

### *Dog 1: Officers Morrison and Gaines shoot Debo near the entrance to the home*

According to Smith, by the time she walked back to the living room, the officers were entering the house and Debo had escaped from the basement. "The first thing after I put the dogs up, my dog Debo . . . pushed the stove, and next thing you know he is standing beside me with the officers…He got out the – barricade, came to where I was at, stood there beside me, as the police officer was standing there with the guns already pointed, so as soon as that happened they – he shot him right next to me, right by my feet." (*Id.* at 28). As Smith described the situation, Debo was sitting or standing next to her when the officers shot at least three or four rounds, hitting Debo in the head (*Id.* at 28-29).

Officer Morrison was the first police officer to enter the residence. (Morrison Dep. at 37-38). He testified that upon entering the residence, he immediately encountered Debo, a "vicious" grey Pit Bull. (*Id.* at 33-34). Officer Gaines said, "[t]he dog was immediately charging, trying to come out and attack us." (Gaines Dep. at 16). Officer Morrison expressed concern that retreating would put the other officers, who were on the porch behind him, at risk. (Morrison Dep. at 39-40). He was also concerned that if the dog was able to reach him, he would get mauled. (*Id.*). Officer Morrison fired one shot low, down at Debo's legs, because Smith was standing

behind the dog. (*Id.* at 33-34, 38). Debo was approximately three feet away from Smith when Officer Morrison shot him. (*Id.* at 40).

Officer Morrison says that Smith then asked the officers if she could "put the dog up." (Morrison Dep. at 43). Smith took Debo through the dining room, into the kitchen. (Gaines Dep. at 20; Diagram, Position No. 6). Officer Gaines, who could see Smith holding Debo in the kitchen, claims that Smith lost control of Debo, who then charged at him. (Gaines Dep. at 21-22, 25-26). Officer Morrison testified that Debo charged through the dining room into the doorway between the living room and dining room. (Morrison Dep. at 38). Officer Gaines fired at least seven rounds at Debo. (Gaines Dep. at 51). Debo died next to Smith, in the doorway between the dining and living rooms. (Smith Dep. at 28-32).

### Dog 2: Officers Morrison, Gaines and Paul shoot Smoke in the bathroom

The police officers continued to clear the residence. After hearing barking from the bathroom, Officer Morrison cracked the door open to check whether any people were inside with the dog. (Morrison Dep. at 53-54). Officer Morrison did not see any people in the bathroom, so he closed the door. (*Id.* at 54-56). However, Officer Morrison did see Smoke in the bathroom, whom he described as a "vicious" dog that was "growling and exhibiting a posture or other indicators that a [sic] imminent attack is

probably going to occur." (*Id.* at 64). Smith disputed this description, and said that Smoke was not barking. (Smith Dep. at 39).

Officers Morrison, Gaines, and Howell all testified that Smoke then opened the closed bathroom door by himself. (Gaines Dep. at 15, 33-34; Morrison Dep. at 61; Howell Dep. at 29). According to Officer Gaines, "[t]he dog opened the door. It was amazing. I was amazed. I was literally amazed." (Gaines Dep. at 33). Officer Howell said that she was worried a person was in the bathroom when she heard the doorknob jiggle, before seeing that the dog had opened it. (Howell Dep. at 29). None of the police reports or documents reference Smoke opening the bathroom door. (Wawrzyniak Dep. at 27-28).

Officers Morrison and Gaines testified that after opening the bathroom door, Smoke became trapped between the inward-opening door and the vanity in the bathroom. (Morrison Dep. at 61; Gaines Dep. at 36, 40). They say they shot Smoke before he could break free through the partially opened door. (Morrison Dep. at 62; Gaines Dep. at 15). Later, Officer Paul entered the bathroom and shot Smoke, who had already been mortally wounded, to stop his suffering. (Paul Dep. at 15).

Smith testified that the police officers discussed whether or not to shoot the dog in the bathroom before shooting through the door. (Smith

Dep. at 37-41). According to Smith, Smoke was not attacking or expressing aggression toward the police. (*Id.* at 52-53). Although Smith testified that she had seen the police officers fire multiple shots through the closed bathroom door, she used the word "probably" multiple times when describing the police officers' actions. (*Id.* at 38, 52). When asked what she meant by 'probably,' Smith responded "Well, I didn't actually - you know, I seen when they did what they did, but I didn't see when they – whoa, what am I saying?" (*Id.* at 38).

Officer Morrison expressed concerns that if the police officers did not shoot Smoke, he would have escaped the bathroom area and entered the living room. (Morrison Dep. at 63-64). If Smoke entered the living room, Smith and the police officers would have been in each other's lines of fire, rendering them defenseless against the dog. (*Id.*). Officer Morrison also testified that Smith said she "did not know how to handle" and "couldn't control" Smoke because "it wasn't her dog." (*Id.* at 111-112).

**Dog 3: Officer Paul shoots Mama on the staircase to the basement**

Police officers continued clearing the residence. While Officers Paul and Wawrzyniak were at the top of the staircase leading to the basement, Mama began charging up the stairs. (Paul Dep. at 8; Wawrzyniak Dep. at 46-47). Officer Paul testified that Mama showed her teeth and expressed

an aggressive disposition. (Paul Dep. at 10). Mama climbed the stairs three to five feet, and was between ten and twenty feet away from Officer Paul when he shot and killed her. (*Id.* at 9-10). No narcotics or people were found in the basement. (*Id.* at 13).

Smith saw police officers descend into the basement, where Mama was located, but did not see what happened in the basement and did not see the police officers shoot Mama. (Smith Dep. at 34-36).

Officers found 25.8 grams of marijuana in the residence. Smith was arrested and charged with a misdemeanor violation of Detroit's marijuana law. However, Smith's charges were dismissed when the police officers did not appear in court to testify against her.

Supervisors later ratified the police officers' conduct, concluding that the shootings were all justified. However, as in many other cases, the ratifying officers did so without speaking to the officers about what had transpired.

The police officers conducting the search had not received any specific training on how to handle animal encounters during raids. (Wawrzyniak Dep. at 65). Officer Morrison testified that he had shot thirty-nine dogs before shooting Debo and Smoke. (Morrison Dep. at 67). A Destruction of Animal Report ("DOA Report") indicates that as of July 11,

2016 he had shot at least sixty-nine animals. (DOA Report, at 1). Officer

Gaines testified that he has killed fewer than twenty dogs. (Gaines Dep. at

52). Officer Ryan has shot at least nineteen animals. (DOA Report, at 5).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render

summary judgment "forthwith if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *See Redding v. St.

Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has

affirmed the court's use of summary judgment as an integral part of the fair

and efficient administration of justice. The procedure is not a disfavored

procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.

1995).

The standard for determining whether summary judgment is

appropriate is "'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v.

Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v.

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury

could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing*

*Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Plaintiffs' Fourth Amendment Interest in Their Dogs

Defendants argue that because Smith and Thomas failed to license

their dogs, which is a misdemeanor violation of City and State law, the

dogs were "contraband" and therefore not protected by the Fourth

Amendment. Defendants also argue that Smith had no interest in the dogs

because Thomas was the sole owner. In response, Plaintiffs argue: (1)

Defendants waived the affirmative defense of "license" when they failed to

include it in their pleadings, per Federal Rule of Civil Procedure 8(c); (2)

both Thomas and Smith had possessory interests in the dogs; and (3) there

is no exception to the Fourth Amendment for unlicensed dogs.

#### A. Defendants did not waive their affirmative defense

Plaintiffs contend that Defendants waived their affirmative defense of

"unlicensed dog" when they did not include it in their answer to the

complaint. Federal Rule of Civil Procedure 8(c) provides that "[i]n

responding to a pleading, a party must affirmatively state any avoidance or

affirmative defense," and specifically enumerates "license" as an affirmative

defense.

However, the failure to plead an affirmative defense does not necessarily result in waiver. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993). The purpose of Rule 8(c) is to provide the opposing party notice of an affirmative defense, and a chance to rebut it. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 350 (1971). As long as an affirmative defense is raised within a reasonable time and does not prejudice Plaintiffs' ability to respond, it is not waived. *Moore*, 992 F.2d at 1445-46.

Defendants did not waive their affirmative defense because their failure to raise it did not prejudice Plaintiffs' ability to respond. Even before the onset of litigation, Plaintiffs knew that their dogs were not licensed. Additionally, Plaintiffs had sufficient opportunity to answer this motion. Because Defendants' failure to comply with Rule 8(c) has caused no prejudice, they are permitted to amend their answer to assert it.

B. <u>Smith and Thomas are both "owners" of the dogs</u>

The Michigan Dog Law of 1919 defines a dog's "owner" as "every person having a right of property in the dog, and every person who keeps or harbors the dog or has it in his care, and every person who permits the dog to remain on or about any premises occupied by him." M.C.L.A. § 287.261(2)(c). Smith testified that she co-owned, harbored, and cared for

the dogs. Police reports corroborate the fact that the dogs were killed on premises that Smith and Thomas occupied together. Therefore, Smith and Thomas both constitute owners with possessory interests in the three dogs.

C. Plaintiffs did not have a legitimate possessory interest in their unlicensed dogs

The Sixth Circuit has held that dogs are property, and as a general proposition the unreasonable seizure of that property violates the Fourth Amendment. *Brown v. Battle Creek Police Department*, 844 F.3d 556, 566 (6th Cir. 2016). However, the Supreme Court has held that there is no legitimate property interest in contraband protected by the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). Contraband is defined as "[a]ny property that is illegal to produce or possess." *Contraband*, West's Encyclopedia of American Law (2d ed. 2008). Thus, property that is illegal to produce or possess is not protected by the Fourth Amendment. *United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983).

In both the City of Detroit and the State of Michigan, it is a criminal misdemeanor offense to possess unlicensed dogs. According to the Michigan Dog Law of 1919, it is "unlawful for any person to own any dog 6 months old or over, unless the dog is licensed." M.C.L.A. § 287.262. Failing to license a dog constitutes a misdemeanor offense that is punishable by

imprisonment in the county jail for up to three months, a fine between ten and one hundred dollars, or both a fine and imprisonment. M.C.L.A. § 287.286. The Michigan Dog Law designates unlicensed dogs as public nuisances. M.C.L.A. § 287.277.

Markedly, "[n]othing in [the Michigan Dog Law] shall be construed to prevent the owner of a *licensed* dog from recovery, by action at law, from any police officer or other person, the value of any dog illegally killed by such police officer or other person." M.C.L.A. § 287.287 (emphasis added). The Michigan Dog Law also authorizes individuals, including law enforcement, to kill a dog attacking humans. M.C.L.A. § 287.279. Following this authorization, the statute provides, "[e]xcept as provided in this section, it shall be unlawful for any person, other than a law enforcement officer, to kill or injure or attempt to kill or injure any dog which bears a license tag for the current year." *Id.* In both cases, the statute specifically refers to recovery for *licensed* dogs.

On the other hand, the Michigan Dog Law does not simply authorize officers to seize unlicensed dogs. In 2014, M.C.L.A. § 287.277 was specifically amended to remove a provision that required the sheriff to locate and kill all unlicensed dogs. 2014 Mich. Legis. Serv. 32 (H.B. 4168) (West). Following this amendment, prosecutors must commence

proceedings against the owners of unlicensed dogs before they are seized. M.C.L.A. § 287.277. The Michigan Dog Law of 1919 does require due process including notice and a show cause hearing before unlicensed dogs may be killed for lacking a license. M.C.L.A. § 287.286a.  Of course this specific provision does not apply to the facts of the instant case, where the officers did not shoot the dogs because they were unlicensed.  Rather, the officers shot the dogs for posing an imminent threat to their safety and were not even aware that the dogs were unlicensed.

Detroit City Code § 6-2-1(a) similarly provides that it is unlawful to "own, harbor, keep, or shelter" an unlicensed dog that is over fourth months old. Detroit City Code § 6-2-1(c) provides that the Animal Control Division "is authorized to impound, sell, euthanize, or dispose of any unlicensed dog consistent with the Michigan Dog Law of 1919." Violating this city code constitutes a misdemeanor offense, and is punishable by a fine of up to five hundred dollars, or up to ninety days in jail, or both a fine and imprisonment, for each violated ordinance. Detroit City Code § 6-2-12.

Notably, there is no prior case that explicitly designates unlicensed dogs as contraband or provides that there is no legitimate possessory interest that can be protected by the Fourth Amendment in an unlicensed dog. However, this argument was discussed in the dicta of *Pena v. Village*

*of Maywood*, 2016 WL 1019487 (N.D. Illinois). Near the end of the opinion,

which denied cross motions for summary judgment, the court stated:

> This leads to another nagging question left unresolved by the parties' submissions. As already noted, the Penas had not licensed, registered, or neutered their pit bull, violating three city ordinances…One cannot help but wonder whether the Penas have any legitimate possessory interest in the animal that would be the basis of a Fourth Amendment violation in the first place. *See, e.g., Allen v. Pennsylvania Soc. for Prevention of Cruelty to Animals*, 488 F.Supp.2d 450, 466 (M.D.Pa.2007) ("…the property was contraband and that Allen could have no legitimate property interest in the animals. Without a constitutionally protected property interest in the animals, Allen cannot claim that their prolonged seizure also violated the Fourth Amendment."); *see also Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("…any interest in possessing contraband cannot be deemed 'legitimate'"); *United States v. Goodwin*, 449 F.3d 766, 770 (7th Cir. 2006) (no legally protected interest in contraband); *United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983) (no lawful property interest in unregistered gun). Moreover, if the Penas had followed the law rather than flout it and registered their pit bull, law enforcement might have had notice of the dangerous animal on the premises and acted differently.

*Id.* at *9-10.

In *Janik*, the Seventh Circuit held that the plaintiff did not have a

legitimate possessory interest protected by the Fourth Amendment in an

unregistered disassembled submachine gun, which police had seized

without a warrant. *Janik*, 723 F.2d at 547. However, if Janik had obtained a

license for his weapon, he would have retained a possessory interest in it.

The reasoning from *Janik* extends to the case at hand. Two Pit Bulls and a Rottweiler present a danger to the public similar to an unregistered gun. The Michigan Dog Law explicitly designates unlicensed dogs as public nuisances. M.C.L.A. § 287.277. Additionally, the Dog Law only specifies that damages can be recovered for *licensed* dogs that are illegally killed. M.C.L.A. § 287.287. Had Thomas and Smith licensed their dogs, the police may have had advance notice that they existed. Thomas and Smith committed a misdemeanor violation of both the Michigan Dog Law of 1919 and the Detroit City Code by not licensing their dogs. Consequently, the dogs fit within the definition of contraband, and Plaintiffs do not enjoy a legitimate possessory interest protected by the Fourth Amendment under the particular facts of this case.

D. Claims based on Fourth Amendment violations are dismissed

The Court is aware that this conclusion may not sit well with dog owners and animal lovers in general.  The reason for any unease stems from the fact that while pet owners consider their pets to be family members, the law considers pets to be property. The requirements of the Michigan Dog Law and the Detroit City Code, including that all dogs be current with their rabies vaccines, exist to safeguard the public from dangerous animals.  When a person owns a dog that is unlicensed, in the

eyes of the law it is no different than owning any other type of illegal property or contraband. Without any legitimate possessory interest in the dogs, there can be no violation of the Fourth Amendment. Without any constitutional violation, Plaintiffs have no basis for a 42 U.S.C. § 1983 action against the individual Police Officers and Sergeant, as well as against the City of Detroit.

Because this is an issue of first impression, the court will continue to analyze defendants' other arguments as if plaintiffs did have a legitimate possessory interest in the dogs protected by the Fourth Amendment.

II.  Claims against Officers Wawrzyniak and Howell, and Sergeant Harris

Before evaluating the reasonability of a seizure, the court must determine whether a Fourth Amendment seizure has occurred. *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003). Because Officer Wawrzyniak, Officer Howell, and Sergeant Harris did not fire their weapons or harm the dogs, they did not seize the dogs. Consequently, the § 1983 claims for illegal seizure of the dogs and the state claims of conversion and intentional infliction of emotional distress against Wawrzyniak, Howell, and Harris are dismissed.

III.  Qualified Immunity for Individual Defendants

Defendants argue that all individual defendants are entitled to summary judgment due to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to provide government officials with "breathing room to make reasonable but mistaken judgments," and to protect "all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal citations and quotation marks omitted). The court determines whether an official should be held personally liable for an allegedly unlawful official action based on the "objective legal reasonableness" of their action, "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

The Sixth Circuit applies a two-prong test to determine whether police officers are entitled to qualified immunity: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right

violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Brown*, 844 F.3d at 565 (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)).

A. Violation of a clearly established constitutional right

The Sixth Circuit has held that "there is a constitutional right under the Fourth Amendment to not have one's dog unreasonably seized." *Brown*, 844 F.3d at 566. Additionally, the Circuit has found this right to be clearly established. *Id.* at 567. On the other hand, no Supreme Court, let alone circuit court, precedent clearly establishes whether or not *unlicensed* dogs which are wrongfully possessed are protected by the Fourth Amendment.

B. Reasonableness of seizures

The next inquiry is whether the seizure of the three dogs was reasonable under the Fourth Amendment. The court objectively evaluates whether a dog constitutes an imminent threat from the perspective of a reasonable police officer at the time of the incident, without the benefit of hindsight. *Id.* at 567 (citing *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014)). "Imminent danger" is defined as "[a]n immediate, real threat to one's safety that justifies the use of force in self-defense," or "[t]he danger resulting from an immediate threatened injury sufficient to cause a

reasonable and prudent person to defend himself or herself."[1] *Imminent Danger*, Black's Law Dictionary (10th ed. 2014).

"This analysis allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown*, 844 F.3d at 567 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The Court is inclined to "put itself into the shoes of the officers at the time the actions took place and to ask whether the actions taken by the officers were objectively unreasonable." *Altman v. City of High Point*, 330 F.3d 194, 205 (4th Cir. 2003). "Thus the standard we set out today is that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety." *Brown*, 844 F.3d at 568.

In determining whether seizing the three dogs was reasonable, the "court must 'balance the nature and quality of the intrusion on the

_____

[1] The Detroit Police Department Manual's policy states that "[a]n officer may shoot a dangerous and/or rabid animal that is posing an *imminent threat of danger* to the officers or others only when bystanders are not in jeopardy." (Manual at 1).

individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified [the] particular set of search or seizure.'" *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (internal quotation marks omitted)). The burden is on the plaintiffs to prove that the seizure was unreasonable. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Brown*, 844 F.3d at 568.

Seizures are unconstitutional when they are more intrusive than necessary. *Florida v. Royer*, 460 U.S. 491, 504 (1983). The Fourth Amendment "forbids the killing of a person's dog...when that destruction is unnecessary—i.e., when less intrusive, or less destructive alternatives exist." *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977-78 (9th Cir. 2005) (holding that a "reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment"); *Brown*, 844 F.3d at 568 ("A seizure becomes unlawful when it is more intrusive than necessary").

Before evaluating whether the three dogs each presented an imminent threat of danger, the court must evaluate whether the officers' general plan made the seizure of the dogs more intrusive than necessary. In *Hells Angels*, the court held that shooting the plaintiffs' dogs was unreasonable because the police had "created an entry plan designed to bring them into proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs. The officers, in effect, left themselves without any option but to kill the dogs in the event they—quite predictably—attempted to guard the home from invasion." 402 F.3d at 977-78. In contrast, in *Brown*, the court found that the officers did not have any meaningful time to plan for the dogs, because they only discovered that the dogs existed while they were on their way to execute the raid. 844 F.3d at 570.

The ability of the officers in this case to prepare for the dogs falls in between *Hells Angels* and *Brown*. While the Detroit Police Department had at least three days to prepare for the dogs, the anonymous informant only told Officer Wawrzyniak that Smith and Thomas possibly had a "small dog." Additionally, Plaintiffs did not register their dogs, which might have alerted the police that there were dogs in the residence, although the fact that Plaintiffs were squatters diminishes this possibility. According to Officer

Gaines, it was too late for police to change their plans when they heard the dogs barking at the door because they were concerned that Smith would flush the narcotics down the drain.

Based on this particular set of facts, the Detroit Police Department's plan did not violate the Fourth Amendment. The police were only aware that a "small dog" might be present, and by the time they discovered that there were three large and vicious dogs, they could not change their plans. Because the plan did not violate the Fourth Amendment, the court must evaluate whether each dog posed an imminent threat to police officers when they shot it.

1. <u>Mama: dog shot in stairway to the basement</u>

Claims based on Officer Paul shooting Mama are the simplest to dismiss. In order to survive summary judgment, there must be a "discrepancy between the dog owner's version of events and the officers' testimony" that goes "directly to whether the dog was an imminent threat to the safety of the officers." *Brown*, 844 F.3d at 571 (citing *Robinson v. Pezzat*, 818 F.3d 1, 11 (D.C. Cir. 2016), in which the court reversed summary judgment in favor of the defendants because the plaintiff's testimony that the dog did not attack the officers sufficiently established a

genuine issue of material fact as to whether the shooting was objectively reasonable).

The facts in this case are strikingly similar to *Brown*, where the plaintiffs presented no evidence that contradicted the officers' testimony that they shot a wounded dog that had barked at them from the bottom of a staircase because the dog was preventing them from safely entering and sweeping the basement. 844 F.3d at 570. In *Brown*, police also shot a second dog that was standing and barking in the center of the basement, and shot the second dog again after it ran to the corner of the basement. *Id.*

In the case at hand, Plaintiffs concededly present no evidence rebutting the police officers' claims that the dog they shot was charging up the stairs against them. As in *Brown*, the dog also obstructed their ability to clear the basement for both drugs and people. Thus, there is no material dispute as to whether Mama presented an imminent threat to Officer Paul, who was not unreasonable in shooting it.

2. Debo: dog shot in entryway and between living room and dining room

There is an issue of fact, conceded by Defendants, whether Debo posed an imminent threat to the safety of the officers when Officer Morrison shot Debo near the entrance of the residence. On the one hand, Officers

Morrison and Gaines testified Debo immediately charged them as they entered the house, while Smith testified Debo was standing next to her. This issue of material fact goes directly to the question of whether Debo posed an imminent threat to the officers entering the house such that Officer Morrison was reasonable in shooting the dog.

However, the testimony is undisputed that after Smith took Debo into the kitchen to secure the dog, Debo escaped from her hold and charged the officers. There is no issue of material fact that when Officer Gaines shot and killed Debo in the doorway between the dining and living room, Debo posed an imminent threat to the safety of the officers. Officer Gaines was not unreasonable in shooting Debo.

### 3.  Smoke: dog shot in the bathroom

Although Defendants may be able to establish that there is no issue of material fact that Smoke presented an imminent threat, counsel conceded the issue at oral argument, so we do not address it here.

### IV.  *Monell* Claims Against the City of Detroit

Plaintiffs argue that the City of Detroit violated Plaintiffs' Fourth Amendment Rights pursuant to an unconstitutional custom, policy or procedure under *Monell* for failing to provide any police training for encounters with dogs, and because the Detroit Police Department ratified

the officers' conduct without speaking to them. Defendants counter that under *Brown*, Plaintiffs must show that the City is ignoring a pattern of widespread constitutional violations, tantamount to deliberate indifference. 844 F.3d at 573.

"To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's constitutional rights." *Brown*, 844 F.3d at 573 (citing *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)). Systematically failing to adequately train police officers can constitute a custom or policy that leads to municipal liability. *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010). However, "[t]he inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.'" *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Most importantly, "[t]o establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area

was deficient and likely to cause injury." *Brown*, 844 F.3d at 573 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

The standard for finding a municipality liable essentially amounts to the judicial determination that "the city itself [decided] to violate the Constitution." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)). "'A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' although there are rare circumstances in which 'the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Id.* (quoting *Connick*, 563 U.S. at 62, 64 (internal quotation marks omitted)). The Supreme Court has held that for police officers, it does not:

> suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*Harris*, 489 U.S. at 391.

Plaintiffs have failed to proffer evidence supporting their *Monell* claim, only alluding to one example in which the City settled with a dog owner.

This does not establish a pattern of the City categorically violating a constitutional right, and is insufficient for a *Monell* claim. Additionally, Plaintiffs have not established that their constitutional rights were violated, let alone that a policy or custom of the municipality was a moving force behind the deprivation of Plaintiffs' constitutional rights. Consequently, the *Monell* claims for municipal liability are dismissed.

## V.  Intentional Tort Claims

### A.  Intentional Infliction of Emotional Distress

There are four required elements for a prima facie case of intentional infliction of emotional distress ("IIED"): "(1) extreme or outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Preston v. City of St. Clair Shores*, 2015 WL 12516687, at *10 (E.D. Mich. Dec. 31, 2015) (quoting *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985)).

The Sixth Circuit has reasoned that "[t]he emotional attachment to a family's dog is not comparable to a possessory interest in furniture." *Brown*, 844 F.3d at 566 (quoting *Hells Angels*, 402 F.3d at 975). However, "[p]ets have long been considered personal property in Michigan jurisprudence,' and '[t]here is no Michigan precedent that permits the recovery of damages for emotional injuries allegedly suffered as a consequence of property

damage.'" *Preston*, 2015 WL 12516687 at *10-11 (quoting *Koester v. VCA Animal Hosp.*, 624 N.W.2d 209, 211 (Mich. Ct. App. 2000)). Accordingly the Court grants summary judgment to the Defendants on the Plaintiffs' IIED claim.

B. Unlicensed dogs and conversion claims

"Conversion is any distinct act of dominion wrongly exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960).

There is no liability for the actor if he or she is privileged to dispose of the chattel. *Id.*; *Preston*, 2015 WL 12516687, at *10. In *Preston*, the plaintiff's dog was not properly licensed. 2015 WL 12516687, at *10. This court held that "the officers were privileged to dispose of the dog in accordance with their duty to enforce State laws and City ordinances regarding pet licensing." *Id.* Unlike *Preston*, the dogs in this case were not roaming outdoors, and the police were unaware they were not licensed. However, because the dogs were not licensed, Plaintiffs had no legitimate interest in them. The Michigan Dog Law of 1919 specifically provides that people can recover for when their *licensed* dogs are unlawfully killed.

M.C.L.A. § 287.287. Consequently, Plaintiffs' conversion claims are subject to dismissal as a matter of law.

## C. Police immunity from intentional tort claims

In the alternative, Defendants argue that claims for conversion against individual defendants are subject to dismissal due to immunity. In general, lower level governmental officials and employees are immune from intentional tort liability if "(1) the . . . acts were taken during the course of employment and . . . the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008) (quoting *Ross v. Consumers Power Company*, 363 N.W.2d. 641, 667-68 (Mich. 1984)). Police officers are entitled to immunity under *Ross* if they act in good faith and honestly believe that they are acting within the scope of their duties. *Odom*, 760 N.W.2d at 228-29. On the other hand, defendants acting with malicious intent are exposed to liability. *Id.* at 229.

Discretionary acts are those that require personal deliberation, resolution, and judgment. *Norris v. Lincoln Park Police Officers*, 808

N.W.2d 578, 581 (Mich. Ct. App. 2011). "Granting immunity to an employee engaged in discretionary acts allows the employee to resolve problems without constant fear of legal repercussions." *Odom*, 760 N.W.2d at 226. Police decisions regarding how to respond to citizens, how to safely defuse situations, and how to effectuate lawful arrests are discretionary. *Norris*, 808 N.W.2d at 581.

Officers Gaines and Paul are immune from Plaintiffs' conversion claims for the shooting of Debo in the doorway between the dining and living room and Mama in the stairway to the basement. In both cases, (1) the officers were performing their police duties in executing the search warrant and clearing the home; (2) the officers' undisputed testimony supports their belief that they were in imminent danger; and (3) the officers' actions qualify as "discretionary," as opposed to "ministerial."

Arguably, there is a material issue of fact as to whether the bathroom door was opened or closed when Officers Morrison, Gaines and Paul shot Smoke through the door, and whether Debo was standing still or charging when shot by Officer Morrison upon entering the residence. Construing the evidence in the light most favorable to the non-moving party, Defendants' counsel stated at oral argument that there is a genuine issue of fact as to

whether officers believed Smoke posed an imminent threat if they shot the

dog through a closed bathroom door, and whether Debo posed an

imminent threat if he was shot while standing still. Given this concession,

the court will not grant summary judgment regarding police immunity on

this issue, even though the court would have concluded otherwise in the

absence of the Defendants' disavowal of the argument in their brief.

D. Government immunity on intentional tort claims

Defendant argues that the City of Detroit is also entitled to summary

judgment on intentional tort claims, including conversion, due to

governmental immunity. Michigan law grants municipal immunity from tort

liability as follows:

> Except as otherwise provided in this act, all governmental
> agencies shall be immune from tort liability in all cases wherein
> the government agency is engaged in the exercise or discharge
> of a governmental function. Except as otherwise provided in
> this act, this act shall not be construed as modifying or
> restricting the immunity of the state from tort liability as it
> existed before July 1, 1965, which immunity is affirmed.

M.C.L.A. § 691.1407(1).

In *Ross*, the Michigan Supreme Court held that governmental

agencies are immune from tort liability arising out of any governmental

function, such function being activities expressly or impliedly mandated or

authorized by constitution, statute or law. 363 N.W.2d 641, 661 (Mich. 1984). In determining whether immunity exists for a governmental agency, courts focus on whether the general activity, rather than specific conduct, they were conducting at the time the alleged tort occurred was a government function. *Id.* at 668; *Smith v. Department of Public Health*, 410 N.W.2d 749, 778-779 (Mich. 1987). Notably, a "city cannot be held vicariously liable for torts of its police officers committed during the course of an arrest because the officers were engaged in police activity, which is a governmental function entitled to immunity." *Ross*, 363 N.W.2d at 663-664 (citing *Sherbutte v. Marine City*, 374 Mich. 48, 50 (1964)). Consequently, "no intentional tort exception to the governmental immunity act exists, and…an intentional tort arising out of a governmental function is immune." *Smith*, 410 N.W.2d at 792. Finally, conversion is an intentional tort. *Department of Agriculture v. Appletree Marketing, L.L.C.*, 779 N.W.2d 237, 247 (Mich. 2010).

The general activity the police officers were performing, executing a search warrant, was undoubtedly within the scope of their governmental function. Consequently, Detroit is immune from intentional tort claims, including conversion.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

Dated:  August 2, 2017

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 2, 2017, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk